151 F.3d 1032
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Robert DIAZ, Plaintiff-Appellant,
v.
CITY OF SPRINGFIELD, Illinois, and, the Joint Apprentice
Training Committee for the City of Springfield,
Illinois, Defendants-Appellees.
 No. 97-2532.
 United States Court of Appeals, Seventh Circuit.
 Argued on Feb. 17, 1998.
Decided on July 2, 1998.
 
 Appeal from the United States District Court for the Central District of Illinois. No. 95-3111. Richard Mills, Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. RICHARD D. CUDAHY, Hon. FRANK H. EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 Robert Diaz, a former electrical apprentice for the City of Springfield, Illinois, appeals from a bench trial in which the district court determined that Diaz had not been fired because of his national origin. Diaz, who is Cuban, worked as an apprentice for the City of Springfield from August 1987 until May 1991. The apprenticeship was overseen by the Joint Apprentice Training Committee for the City of Springfield, which is responsible for training apprentices to become "journeymen." The apprenticeship program typically lasts four years and includes extensive classroom training and on-the-job electrical work. Certain aspects of the program are akin to a military boot camp, and apprentices are routinely subjected to harassment and degradation by the journeymen who supervise their work.
 
 
 2
 Whether the Committee advances apprentices through the program depends upon the evaluations received from the journeymen. In January 1988, the Committee first notified Diaz that he was receiving below-average evaluations, and announced that it would temporarily delay advancing him to the second year of his apprenticeship. Diaz was finally promoted in November 1988. In June of 1989, the Committee summoned Diaz to discuss his still-negative reviews. At that time, Diaz informed the Committee that journeymen were razzing him about being Cuban. Diaz then met with a personnel manager, who scheduled a meeting between Diaz and the journeymen who made the inappropriate remarks. Later that summer, Diaz advanced to the third year of his apprenticeship. But the Committee's concerns about his on-the-job performance began to crescendo in 1990, when it held three meetings with Diaz to discuss his poor evaluations. In January 1991, Diaz informed the personnel manager that he had been called a terrorist; the manager told the journeyman who made the remark that his behavior was unacceptable. In February 1991, the Committee declined to move Diaz to the level of fourth-year apprentice and warned that he would be fired unless the assessments of him improved. Diaz had his final meeting with the Committee on May 8, 1991, and his apprenticeship ended two days later. Soon afterwards the City formally terminated Diaz's employment.
 
 
 3
 Diaz filed suit against the Committee and the City of Springfield, asserting that they violated Title VII, which makes it illegal for any employer "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. Sec.2000e-2(a)(1). Pursuant to the burden-shifting method of proof established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Diaz contended that many journeymen refused to train him and criticized him because of his national origin, and that the decisions to end his apprenticeship and employment were by-products of this prejudice. After Diaz established his prima facie case,[1] the defendants countered that Diaz performed his job inadequately--he did not retain information, refused to listen to directions, and worked in an unsafe manner. Following a bench trial, the district judge found that Diaz received poor evaluations for precisely the reasons the defendants articulated--his job performance was substandard. Accordingly, the district judge concluded that Diaz was not discharged because of intentional discrimination. Diaz challenges this factual determination on appeal, but we affirm the district court.
 
 Discussion
 
 4
 Diaz contends that the district court ignored or misapprehended three crucial points: (1) the Committee relied on evaluations by journeymen who had not recently worked with Diaz; (2) Diaz was the subject of constant racial slurs; and (3) the comparative treatment of white and non-white apprentices demonstrated the journeymen's bias. But the district court's conclusion with respect to discriminatory intent (or lack thereof) is a finding of fact. See Pirajno v. International Orientation Resources, Inc., 137 F.3d 987, 990 (7th Cir.1998). As such, we do not set the finding aside unless it is clearly erroneous. And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As we explain below, the district court had plenty of reason to conclude that the defendants terminated Diaz's apprenticeship for legitimate reasons.
 
 
 5
 I. The Journeymen Who Testified Before the Committee
 
 
 6
 With respect to Diaz's first point, the district judge did not err when he determined that the Committee relied on journeymen who had recently worked with Diaz and were generally familiar with his abilities. In January and February 1991, the Committee summoned eight journeymen to comment on Diaz's performance. Diaz complains about five of these individuals: Mark Carlock, Ted Smith, Denver Eytchison, Steve Duke and Don Ott. See Appellant's Br. at 36, 37-38. But each of these journeymen either had recent experience with Diaz, or enough cumulative experience with Diaz to make their evaluations relevant to the Committee's decision. Apprentices rotate between crews, typically for periods of two to three months. Diaz was on a rotation with Carlock for three months in 1988, three months in 1989, as well as in the summer of 1990. See Tr. at 559-560, 569. At the time of Diaz's termination, Carlock held a supervisory position which placed him in contact with all of the crews on which Diaz worked. In regard to Smith, Diaz worked with him for at least three months in both 1989 and 1990, and for one week in 1991. See Tr. at 767, 769. Eytchison testified that he was on the same crew as Diaz "probably four different occasions for three months or so at a time." Tr. at 692. Furthermore, on April 5, 1991, after Eytchison appeared before the Committee, he evaluated Diaz again. See Tr. at 721. Duke worked with Diaz for an indeterminate amount of time in 1989, five months in 1990, and for an indeterminate (but apparently very short) amount of time in 1991. See Tr. at 681-82. Duke's final evaluation of Diaz was on March 7, 1991. Finally, Ott was on the same crew as Diaz in March and April 1991, and evaluated him on March 7, April 23 and May 6.
 
 
 7
 Diaz also suggests that the district judge should have given weight to the Committee's failure to summon Ray Gillespie before ending Diaz's apprenticeship. Diaz describes Gillespie as the "journeyman who at that time had the most recent work experience" with him. Appellant's Br. at 37-38. But we are utterly at a loss as to why Diaz would have wanted the Committee to rely on Gillespie. At trial, Gillespie criticized Diaz's climbing abilities and his attitude. Gillespie stated that as a third-year apprentice, Diaz was slower than the average second-year apprentice. Gillespie also explained that he once had to tell Diaz to get off a pole because Diaz was working in a manner that was the "number one no-no in the trade" because it might cause electrocution. Tr. at 737. Thus it appears that if the Committee had spoken with Gillespie, it would have had even more reason to terminate Diaz. In sum, nothing suggests that the Committee relied on journeymen who lacked recent experience with Diaz or broad-based knowledge of his abilities.
 
 B. The Frequency of Inappropriate Remarks
 
 8
 As Diaz acknowledges, "Evidence of a supervisor's occasional or sporadic use of a slur directed at an employees' race, ethnicity, or national origin is generally not enough to support a claim under Title VII." Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1266 (7th Cir.1993). The district court found that Diaz had been the target of some (to put it mildly) highly inappropriate remarks--such as "wetback," "nigger turned inside out," and "Cuban asshole"--but that such comments were infrequent. The district court further concluded that the slurs were unrelated to the journeymen's negative evaluations of Diaz.
 
 
 9
 To convince us that the district court erred in finding that the slurs were only sporadic, Diaz cites the testimony of five fellow workers: Matt Small, Terry Byrd, Joe Neece, Paul O'Connor and Rico Johnson. But the statements of these individuals do not suggest clear error by the district court. Matt Small testified that he was on projects with Diaz only four or five days each year. See Tr. at 354. Small therefore was not in a position to determine whether Diaz was subject to constant abuse. Terry Byrd similarly worked with Diaz for no more than six days during Diaz's entire apprenticeship. See Tr. 121-22. As such, Byrd was in no position to determine the frequency of abuse. Moreover, while Byrd testified that Diaz was treated poorly, he did not mention racial or ethnic slurs. Joe Neece and Paul O'Connor also failed to testify about such insults. See Tr. at 79-91, 92-98. Finally, Johnson only stated that he heard Carlock denigrate Diaz's national origin "maybe a couple times." See Tr. at 104.
 
 
 10
 We are also satisfied with the district judge's finding that no significant connection existed between the name-calling and Diaz's below-average evaluations. The evidence showed that "hazing"--whatever its merits--was a routine component of a lineman apprenticeship. Harsh language, belittling remarks, and inappropriate slurs were part and parcel of the apprentice-journeymen relationship. All of Diaz's witness testified that they were made miserable by hazing, and that, in the words of Matt Small, "I was treated with the most disrespect of any job I've ever had in my life." Tr. at 346. Diaz himself stated that the journeymen frequently ridiculed a white apprentice because he was Catholic and "one of the guys that wouldn't look at a Playboy magazine or anything like that." Tr. at 156. Although other constructions of the evidence were possible, it was not unreasonable for the district judge to conclude that Diaz had not been subjected to anything out-of-the-ordinary. We also note that Diaz received negative evaluations from individuals whom he did not characterize as biased. For example, Diaz testified that foreman Ted Smith "talk[ed] to me when he had to teach me stuff.... [H]e didn't do any name calling as far as I recall, no." Tr. at 155. Although Smith told the Committee that he would be willing to work with Diaz, he also described Diaz as approximately one year behind other third-year apprentices, as having climbing skills that would hamper primary work, and as making mistakes again and again. See Def.'s Ex. 1B. Given all this, we cannot find that the district court clearly erred.
 
 C. Comparative Treatment
 
 11
 Diaz's final argument is that the district court ignored evidence about the comparative treatment of white and non-white apprentices. Two whites were allowed to become journeymen despite marginal performances during their apprenticeships. But these individuals are distinguishable from Diaz, whose work raised significant safety concerns. On more than one occasion Diaz started small fires. See Tr. at 788. He fell 30 feet while working on a pole. See Tr. at 785-86. He failed to mark wires before cutting them, thereby prolonging a power outage. See Tr. at 463. In contrast, one of the white apprentices had a fear of heights and difficulty climbing poles, but a sound safety record. See Tr. at 795. The other white apprentice demonstrated an ability to "learn from his mistakes. And you could talk to him and resolve things that he was doing wrong and move on to other things." Tr. at 794. Diaz, on the other hand, would receive instructions and then forget them. Tr. at 783. He did "not learn from mistakes." Defs.' Ex. 1B (statement of Ted Smith). The district court therefore had plenty of evidence from which to conclude that the Committee and City were justified in retaining the two white apprentices and terminating Diaz. Further, the evidence showed that the defendants advanced a number of minority apprentices who now work for the City as journeymen or foremen. See Tr. at 67, 347, 450, 603 and 873. The district court thus did not clearly err in discounting Diaz's argument about the comparative treatment of white and minority apprentices, and concluding that Diaz had not been terminated because of intentional discrimination.
 
 
 12
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 A plaintiff who claims discriminatory discharge must show that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he was discharged; and (4) the employer would not have taken the adverse action if the plaintiff had not been a member of a protected class and everything else remained the same. See Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir.1996); see also Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir.1997)